**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| **LINDA TAYLOR,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **vs.** ) | **Case No. 4:13cv0453 TCM** |
| ) | |
| **CAROLYN W. COLVIN,** ) | |
| **Acting Commissioner of Social Security,** ) | |
| ) | |
| **Defendant.** ) | |

## MEMORANDUM AND ORDER

This 42 U.S.C. § 405(g) action for judicial review of the final decision of Carolyn W. Colvin, the Acting Commissioner of Social Security (Commissioner), denying the application of Linda Taylor for disability insurance benefits (DIB) under Title II of the Social Security Act (the Act), 42 U.S.C. § 401-433, is before the undersigned for a final disposition pursuant to the written consent of the parties. See 28 U.S.C. § 636(c).

## Procedural History

Ms. Taylor (Plaintiff) applied for DIB in April 2010, alleging she was disabled since January 28 of that year by degenerative disc disease (spondylolisthesis), sciatica, left leg pain and immobility, osteoarthritis of the spine, residuals of a back injury, irritable bowel syndrome (IBS), a gastric ulcer, a hernia, interstitial cystitis, ankle injury, depression, asthma, extensive environmental allergies, high blood pressure, two missing discs in lower vertrabae, high blood pressure, and difficulty walking and standing. (R.[1] 134-35, 169.) Her

---

[1] References to "R." are to the administrative record filed by the Commissioner with her answer.

application was denied on initial review and following an August, 2011 hearing before Administrative Law Judge (ALJ) Victor L. Horton. (Id. at 8-23, 30-65, 73, 77-81.) The Appeals Council denied Plaintiff's request for review, effectively adopting the ALJ's decision as the final decision of the Commissioner. (Id. at 1-3)

## Testimony Before the ALJ

Plaintiff, represented by counsel, and Jeffrey F. Magrowski, Ph.D., a vocational expert (VE), testified at the administrative hearing.

Plaintiff testified that she was then 51 years of age and lives in a single-floor house with her husband. (Id. at 35.) Her two grown children do not live with them. (Id.) There is a basement in their house with a washer, dryer, and son and a "little TV room." (Id. at 36.) She has a degree in accounting from a community college. (Id.) She is 5 feet tall and weighs approximately 180 pounds. (Id. at 37.)

Because of problems with her hands, she cannot hold onto books or magazines. (Id.) Also, cataracts in her eyes make it hard for her to focus. (Id.) She can do simple arithmetic. Occasionally, she writes. (Id.)

Plaintiff testified that she used to receive unemployment. (Id. at 38.) She was "ready, willing, and able to do work within my abilities and medical limitations . . . ." (Id.) But, she could not find work that met those criteria. (Id.) She had filed a worker's compensation claim for injuries she sustained to her left ankle and right elbow. (Id.) There was no settlement yet. (Id.)

The medical problems that keep Plaintiff from working include problems with her neck, back and legs. (Id. at 42.) She had an injection in her neck the last year, has had

physical therapy, and takes tramadol (a pain reliever). (<u>Id.</u> at 42-43.) She has pain in her back that radiates to her legs. (<u>Id.</u> at 43.) For this, she takes pain medication and has had physical therapy. (<u>Id.</u>) She also has interstitial cystitis.[2] (<u>Id.</u>) When that acts up, she cannot leave the bathroom. (<u>Id.</u>) The problem started two and one-half years ago. (<u>Id.</u> at 44.) The problems with her lower back started with an injury about twenty-five years ago and occasionally flare up. (<u>Id.</u>) Now, she can no longer control the pain. (<u>Id.</u>) Her neck pain started five years earlier. (<u>Id.</u>) Her IBS gives her constant diarrhea. (<u>Id.</u>) It is caused by stress, "which is anything out of [her] home." (<u>Id.</u>) Other impairments that prevent her from working include depression and anxiety. (<u>Id.</u> at 45.) She has had depression for a long time and has only recently begun to receive treatment for it. (<u>Id.</u>) She has had anxiety off and on for the same period of time. (<u>Id.</u>) She is receiving treatment from a psychiatrist for both the depression and anxiety. (<u>Id.</u>) She also has asthma and allergies, for which she takes Singulair and uses an inhaler. (<u>Id.</u>) She has carpal tunnel syndrome; surgery is to be scheduled. (<u>Id.</u> at 45-46.) Also, she has migraines and cataracts that make it difficult for her to focus. (<u>Id.</u> at 46-47.) She has had the migraines sporadically for years and continually for the past year and a half. (<u>Id.</u> at 47.) Her right elbow locks up on her and gets weak. (<u>Id.</u>) Her medications cause side effects of headaches, drowsiness, forgetfulness, and confusion. (<u>Id.</u>) She cannot turn her head all the way to the left. (<u>Id.</u> at 56.)

---

[2]Interstitial cystitis, or painful bladder syndrome, causes bladder pressure, bladder pain, and, sometimes, pelvic pain. Mayo Clinic, <u>Interstitial cystitis</u>, <u>http://www.mayoclinic.org/diseases-conditions/interstitial-cystitis</u> (last visited Mar. 27, 2014). The pain ranges from mild discomfort to severe pain. <u>Id.</u>

Plaintiff last worked in January 2010 at Elite Laundry Service. (Id. at 38-39.) She also worked for another company, Futura Coatings, doing accounts payable and handling the mail. (Id. at 41.)

Plaintiff does not smoke or drink. (Id. at 48.) She was not drinking in May 2010. (Id. at 53.) She has not used illegal drugs since high school when she smoked marijuana with friends. (Id. at 48-49.) Plaintiff drives short distances, cooks easy meals, and "put[s] a few dishes in the dishwasher." (Id. at 49.) She tries to fold the laundry. (Id.) Her husband puts the laundry in the washer and dryer. (Id.) She shops only for light items. (Id. at 50.) She had organized her brother and sister to help with their father's care until he died in November 2009. (Id. at 52-53.) She does not do any gardening. (Id. at 54.)

Plaintiff further testified that she can walk approximately 50 to 100 feet before having to stop and rest for ten to fifteen minutes. (Id. at 54.) She cannot stand in one place for longer than ten minutes or sit for longer than ten to fifteen minutes. (Id. at 54-55.) She can only lift something if it is lighter than a milk jug. (Id. at 55.) She has trouble bending over to put on clothes and with buttons. (Id.)

She spends three to four hours in bed during normal waking hours and a total of five hours in a recliner. (Id. at 57-58.)

Dr. Magrowski identified Plaintiff's past production work as light and unskilled; as an operations manager in a laundry as medium as she performed it, light as performed in the national economy, and skilled in either capacity; as an accounts payable clerk as skilled and sedentary; and as a mail clerk as semiskilled and sedentary. (Id. at 59-60.) She had some transferable skills. (Id. at 60.)

The ALJ then asked him to assume a hypothetical claimant of Plaintiff's education, training, and work experience who was limited to sedentary work with additional restrictions of occasionally crouching, stooping, kneeling, and climbing ramps and stairs; never crawling or climbing ropes, ladders, or scaffolds; frequently reaching overhead; and having to avoid concentrated exposure to extreme cold, extreme heat, wetness, humidity, fumes, odors, dust, gas, hazards, and heights. (Id. at 60.) Also, she could understand, remember, and carry out at least simple instructions and non-detailed tasks; demonstrate adequate judgment to make simple, routine work changes; perform repetitive work according to set procedures, sequence, and pace, and perform some complex tasks. (Id.) Asked if this claimant could perform any of Plaintiff's past work, Dr. Magrowski replied that she could perform the jobs of a mail clerk. (Id. at 60-61.) There were, however, other jobs she could perform, including that of a food and beverage order clerk and appointment clerk. (Id. at 61.)

All these jobs could also be performed by a hypothetical claimant who was also limited to frequent fine or gross hand manipulation and to performing work at a normal pace without production quotas. (Id. at 61-62.) If this hypothetical claimant also needed a sit/stand option allowing her to change positions frequently, the jobs would remain. (Id. at 62.)

If the ability of the hypothetical claimant to do gross and fine hand manipulation was reduced to occasional from frequent, she could perform work as a surveillance system monitor or call-out operator. (Id. at 62-63.) If the claimant missed more than four days of work a week, the jobs would be eliminated. (Id. at 63.) If there needed to be a bathroom nearby, a special accommodation would have to be made. (Id. at 63-64.)

Dr. Magrowski stated that his testimony was consistent with the *Dictionary of Occupational Titles*. (Id. at 64.)

### Medical and Other Records Before the ALJ

The documentary record before the ALJ includes documents generated pursuant to Plaintiff's applications, records from health care providers, and assessments of her mental and physical functional capacities.

The medical records begin with those of Plaintiff's consultation on January 12, 2009, with Robert Stoffa, M.D., for problems she was having with digestive irritation with certain foods, stress, and anxiety. (Id. at 503.) She was diagnosed with gastroesophageal reflux disease (GERD) and Barrett's esophagus. (Id.)

Nine days later, she had a follow-up appointment[3] with Crystel D. Knierim, M.D., an orthopedist, for her right elbow and left ankle problems resulting from an August 18, 2008, injury. (Id. at 275.) Her right elbow was much improved and had a full range of motion. (Id.) Dr. Knierim released Plaintiff to return to full activities with the arm as tolerated. (Id.) She had numbness in the left ankle and pain when she stood or walked longer than five minutes. (Id.) A previous cortisone shot had made no difference. (Id.) She was to have an electromyogram (EMG) and nerve conduction study of the ankle. (Id.)

Two days later, Plaintiff saw Heidi Prather, D.O., with Washington University Orthopedics, for low back pain. (Id. at 441-42.) She reported that the pain had not gotten better since she had last seen Dr. Prather in 2007. (Id. at 441.) She wanted to go back to

_____

[3]The administrative record does not include a report of an earlier appointment.

physical therapy.  (Id.)  On examination, Plaintiff had pain with forward flexion of her back, but not with extension.  (Id.)  Strength testing for hip flexion, knee extension, and ankle dorsiflexion was normal.  (Id.)  Dr. Prather recommended restarting physical therapy and aerobic conditioning.  (Id.)

Plaintiff reported to Dr. Knierim on February 16 that she had been referred elsewhere for treatment of her foot. (Id. at 276.)  She further reported that her elbow "continue[d] to cause occasional tweaking pain."  (Id.)  On examination, she had mild discomfort with resisted wrist extension and lacked 10 degrees of full extension.  (Id.)  She had a cortisone shot, was given no restrictions on the elbow, and was to return in three weeks.  (Id.)

The next week, Plaintiff was seen by Craig Aubuchon, M.D., for an independent medical evaluation (IME) of her complaints of left foot pain following the August 2008 a work-related injury.  (Id. at 394-98.)  Plaintiff explained that she had sprained her left ankle twice: once on August 18, 2008, and again three weeks later.  (Id. at 394.)  She was placed on crutches after the first injury, was sent to physical therapy, and was told to use ice and ibuprofen.  (Id.)  She was placed in a brace after the second injury, and continued with physical therapy.  (Id.)  She reported that she was still weak.  (Id.)  The ankle was still painful and became swollen when she walked a lot.  (Id.)  Her medical history included high blood pressure, asthma, IBS, osteoarthritis, stress incontinence, headaches, seasonal allergies, and interstitial cystitis.  (Id.)  She denied the use of daily alcohol, and had not smoked cigarettes since 1997.  (Id. at 395.)  Dr. Aubuchon reviewed Plaintiff's ankle-related medical records.  (Id. at 395-96.)  On examination, he found no swelling in her left ankle compared to the right.  (Id. at 396.)  There was diffuse tenderness about that ankle and decreased

sensation to pinwheel. (Id.) She had a negative Tinel's sign and was not tender over the Achilles tendon. (Id.) She walked with a normal heel to toe gait. (Id.) She had about 5 degrees of ankle dorsiflexion and 40 degrees of plantarflexion. (Id.) He opined that she had some lateral ligament instability. (Id. at 397.) Her significant numbness and tingling did not coincide with "a true dermatomal distribution." (Id.) Consequently, he recommended an EMG and nerve conduction study be obtained. (Id.)

When seen by Dr. Knierim on March 9, Plaintiff continued to have a lack of extension of the right elbow by a few degrees, but it was "much better than it had been." (Id. at 277.) She was to do a series of stretching and strengthening exercises and return in three weeks. (Id.)

On March 16, on the referral of Scott J. Anderson, M.D., Plaintiff was seen by a cardiologist, Darlene Eyster, M.D., for her complaints of recurring, nonexertional chest pain. (Id. at 283-86.) She was overweight, in no acute distress, and oriented to time, place, and person. (Id. at 283.) Her heart had a normal rate and rhythm. (Id. at 284.) Her gait and muscle strength were normal. (Id.) Her blood pressure was high. (Id.) Dr. Eyster opined that Plaintiff's chest pain was likely gastroesophageal, but, because she was high risk for coronary artery disease, decided that she should have a stress thallium test. (Id.)

Dr. Aubuchon saw Plaintiff again on March 24, noting that her care had been transferred to him after the IME. (Id. at 393.) She reported that her left foot still felt stiff, although she had been going to therapy for months. (Id.) She had a positive Tinel's sign behind the medical malicolus and over the tibial nerve. (Id.) He again recommended an

EMG and nerve conduction study to rule out tarsal tunnel syndrome. (Id.) She was to continue to work with restrictions. (Id.)

On April 1, when seen again by Dr. Knierim, Plaintiff had good extension of the right elbow, but irritability along the ulnar nerve. (Id. at 278.) Flexion was almost full, but was still less than on the left. (Id.) The orthopedist recommended an EMG of the elbow. (Id.)

Two weeks later, Plaintiff returned to Dr. Aubuchon, complaining of significant pain and numbness in her left ankle that she did not have before her injuries. (Id. at 392.) As before, she had a positive Tinel's sign over the tarsal tunnel. (Id.) She "walked with a relatively normal heel to toe gait." (Id.) Dr. Aubuchon noted that the EMG and nerve conduction studies "were equivocal in they [did] not actually positively discern tarsal tunnel syndrome," but her symptoms were consistent with such. (Id.) The possibility of tarsal tunnel release surgery was discussed and deferred. (Id.) Plaintiff was to continue to work with restrictions. (Id.)

A May 7 EMG showed no evidence of nerve compression. (Id. at 279.) Dr. Knierim concluded that the only remaining treatment option was time. (Id.)

On May 20, Plaintiff underwent a dual isotope stress test and nuclear imaging of her heart. (Id. at 287-307.) The stress test was negative for ischemia, as was the nuclear imaging. (Id. at 287-88.) The latter did reveal mid to distal septal hypokinesis with an otherwise complete normal left ventricular systolic function. (Id.)

Plaintiff saw Dr. Aubuchon on June 6 for a follow-up. (Id. at 391.) She was still having left ankle pain. (Id.) She was caring for her mother, who was in hospice with

terminal cancer, and her father, who was "extremely visibly impaired." (Id.) Her restrictions of being on her feet for 90 minutes with 20 minutes of sit-down work in between were continued. (Id.) She was to return in two months. (Id.)

Plaintiff was seen later that month by Ann G. Martin, M.D., for eczema and rosacea. (Id. at 379.)

On July 8 , Plaintiff returned to Dr. Prather, explaining that she had not yet started physical therapy. (Id. at 443-44.) Her mother was in hospice care and Plaintiff was "having to care and do all of the care for her husband or her father." (Id. at 443.) On examination, she "ha[d] diffuse tender trigger point areas in the quadratus lumborum and upper and middle trap." (Id.) Strength testing was normal. (Id.) She was diagnosed with thoracic and lumbar myofascial pain. (Id.) She wanted to try acupuncture, physical therapy, and massage therapy, and was given referrals for each. (Id. at 443, 445-47.)

A July 15 magnetic resonance imaging (MRI) of Plaintiff's lumbar spine showed grade II anterolisthesis[4] of L5 on S1 secondary to pars defects bilaterally and levoscoliosis of the lumbar spine with degenerative changes. (Id. at 449-50.)

The massage therapist wrote Dr. Prather after seven visits with Plaintiff, explaining that Plaintiff reported she had decreased pain for three to four days after a treatment but that the pain and tightness would then return in the cervical and lumbar areas. (Id. at 451.) Plaintiff also reported decreased symptoms overall. (Id.)

---

[4]Grade II anterolisthesis is 26 to 50 percent forward slippage of one vertebral body on another. NCBI, Bone Disorders of the Spine, http://www.ncbi.nlm.nih.gov/books/NBK27236/ (last visited Mar. 27, 2014).

On August 18, when seen again by Dr. Aubuchon, Plaintiff reported "significant discomfort and numbness along the medial plantar nerve distribution and significant pain across her ankle." (Id. at 390.) Her mother had since passed away. (Id.) The examination findings were similar to the ones at the previous visit. (Id.) Dr. Aubuchon's impression was that Plaintiff had entrapment of her tibial nerve and synovitis of her ankle. (Id.) Conservative measures having failed, the remaining option was an operative intervention. (Id.) She wished to proceed with that option. (Id.)

August 31 chest x-rays showed no acute cardiopulmonary disease and no changes since an April 2008 study. (Id. at 420.)

The physical therapist wrote Dr. Prather in September that, after eight sessions, Plaintiff demonstrated an improved tolerance to exercise and an improved range of motion in her lumbar spine. (Id. at 453.) She did not complain as much as when she started therapy. (Id.) She understood she needed to exercise, but the therapist questioned whether she did so. (Id.) It was decided that Plaintiff would continue with a home exercise program until her appointment with Dr. Prather the next month. (Id. at 452.)

When Plaintiff did see Dr. Prather in October, she was "able to go through lumbar flexion, extension, side bending and rotation." (Id. at 456-57.) Her cervical spine range of motion was within functional limits. (Id. at 456.) The diagnosis was cervicothoracic myofascial pain. (Id.) She was going to switch to acupuncture – finances had prevented an earlier consultation – and see a physical therapist once or twice a month. (Id. at 454-56.)

Complaining of painful left ear popping and ringing, Plaintiff saw Carla Moore Beckerle, A.N.P., a nurse practitioner with Dr. Anderson's practice, in November. (Id. at 402.) She

did not have a fever or coughing. (Id.) Her pharyngitis had resolved. (Id.) She was diagnosed with eustachian tube dysfunction and prescribed a Medrol dose pack. (Id.)

On December 7, Plaintiff consulted Oscar Hantz, M.D., an ear, nose, and throat specialist, for worsening rhinitis and a clogged left ear. (Id. at 355-56, 358.) A computed tomography (CT) scan of her sinuses was "completely normal and clear." (Id. at 356.) She was prescribed prednisone. (Id. at 355.)

Two days later, Plaintiff went to Fast Track Urgent Care for complaints of a low-grade fever, ear pain, fatigue, and a cough. (Id. at 311-17.) She thought she might be getting an ear infection. (Id. at 311.) Chest x-rays were negative. (Id. at 317.) She was diagnosed with a middle ear infection (otitis media) and acute bronchitis, and was prescribed an antibiotic, Levaquin, and a cough medicine, Tessalon. (Id. at 314, 315.)

Plaintiff went to the emergency room at Missouri Baptist Medical Center on December 15, reporting that she had been sick for two months and was becoming progressively worse. (Id. at 321-48.) The medications given her at the urgent care center had provided no relief. (Id. at 328.) Her past medical history included asthma; interstitial cystitis, IBS, and shoulder surgery. (Id. at 329.) On examination, she had a small amount of fluid behind her left tympanic membrane. (Id. at 331.) She had a normal range of motion in all her extremities. (Id.) A CT scan of her sinuses showed nothing acute. (Id. at 324.) X-rays of her chest showed no active cardiopulmonary disease. (Id. at 327, 338, 421.) She was treated with an Albuterol nebulizer and reported some relief. (Id. at 339.) She requested a new primary care physician. (Id.) She was diagnosed with a cough, given a prescription for a Proventil inhaler and instructed to take two puffs every four to six hours for her asthma,

and discharged home in stable condition.  (Id. at 340, 344, 345.)  She was given two names of physicians and instructed to follow up with them for further treatment.  (Id. at 344.)

Later that same day, she called Dr. Hantz, explaining that the prednisone was not working.  (Id. at 354.)  She still had mucous, a low-grade fever, and ear pain, and wanted an antibiotic.  (Id.)  Levaquin was prescribed.  (Id.)

Also on December 16, the physical therapist wrote Dr. Prather that Plaintiff had been seen for only one of three additional appointments.  (Id. at 458.)  She had a full range of motion in her cervical spine and upper extremities.  (Id.)  Her neck was getting worse.  (Id.) "[She] demonstrate[d] few objective findings to warrant her numerous subjective complaints."  (Id.)

When Dr. Prather saw Plaintiff the next day, Plaintiff had pain with cervical extension, rotation to the right, and side bending to the right.  (Id. at 459-60, 465-69.)  X-rays of her knees showed "[s]mall right knee effusion without underlying radiographic bone or alignment abnormality" and "[m]ild left medial compartment osteoarthritis."  (Id. at 465.) X-rays of her cervical spine showed degenerative disc disease at C5-C6 with small associated kyphosis that was reduced on extension and bilateral uncovertebral joint hypertrophy at C4-C5 and C5-C6.  (Id. at 469.)  She was to re-start physical therapy and massage therapy.  (Id. at 459, 462-63.)  Also, Dr. Prather completed a "Physician's Statement for Disabled Person's License Plates/Placard" on Plaintiff's behalf.[5]  (Id. at 461.)

_____

[5]She completed the statement three more times.  660-62.)

Plaintiff saw another physician, Sheldon L. Davis, M.D., in Dr. Hantz' practice on January 19, 2010.  (Id. at 353, 357.)  She complained of pressure in her right ear and popping in her left ear when she swallowed.  (Id. at 353.)  Her hearing was within normal limits.  (Id. at 357.)  She was told to use a humidifier, avoid decongestants, and prescribed guaifenesin (an expectorant).  (Id. at 353.)  Dr. Davis wrote Dr. Anderson of his findings, including that Plaintiff's middle ear pressures were normal and that there "was some minimal tenderness" to her temporomandibular jaw (TMJ).  (Id. at 414-15.)

Ten days later, Plaintiff underwent an arthroscopy of her left ankle with synovectomy and then tarsal tunnel release to address her complaints of the numbness in the ankle and its tendency to go to sleep. (Id. at 359-72.) Following the operation, Dr. Aubuchon placed Plaintiff in a CAM walker boot.  (Id. at 362, 365.)

Plaintiff was wearing her boot when she saw Dr. Aubuchon on February 8.  (Id. at 388-89.)  X-rays of her left ankle showed "good cartilage height with no acute changes of the ankle joint itself."  (Id. at 389.)  She was currently medically unable to work.  (Id. at 388.)

Plaintiff reported to Dr. Aubuchon two weeks later that she "still ha[d] a small amount of numbness in the medial plantar nerve distribution" and limited ankle and subtalar motion.  (Id. at 387.)  Her ankle was not "significantly painful" when moved.  (Id.)  She was to begin physical therapy and was released to "sit-down work only."  (Id.)

At a follow-up appointment with Dr. Anderson on March 8 for her hypertension, hyperlipidemia, IBS, depression, and elevated fasting blood sugar, Plaintiff reported that she was "miserable" and had had a very stressful year that included losing her job, the death of

both parents, and being under financial stress.  (Id. at 403, 519, 523-24.)  She did not take any medications for her IBS, wanted to try a different antidepressant (Celexa had proved to be ineffective), and was compliant with her other medications.  (Id. at 403, 519.)  She was prescribed Lexapro for the depression; she did not want any medications for her IBS.  (Id.)  Her hypertension was under "[e]xcellent control."  (Id.)  Diet, exercise, and sleep were discussed to address her complaints of fatigue.  (Id.)  She was to return in six months or sooner if needed.  (Id.)

Plaintiff saw Dr. Martin again on March 19 for a recent flare-up of rosacea on her face and hives on her abdomen.  (Id. at 377-78, 382-83.)  She was prescribed an antibiotic, minocycline, and told to use lotion with a sun protection factor.  (Id. at 383.)

Plaintiff still had some discomfort and swelling in her left ankle when she saw Dr. Aubuchon on March 23, "particularly when she [was] up on it for periods of time."  (Id. at 386.)  She had shooting pain that went into the arch of her foot.  (Id.)  At times, she still had numbness in the ankle; however, it had improved since the surgery.  (Id.)  Also, she still had some swelling across the ankle and some limited ankle dorsiflexion.  (Id.)  She was finished with physical therapy.  (Id.)  Dr. Aubuchon opined that she could begin progressive work hardening.  (Id.)  She could return to sedentary work and could be on her feet for thirty minutes out of sixty.  (Id.)  She reported that the facility she had worked at had closed.  (Id.)  Dr. Aubuchon noted that she became "somewhat irritated" when he explained that it was

appropriate regardless for her increase her activities. (<u>Id.</u>) He was to see her after she completed work hardening.[6] (<u>Id.</u>)

On April 2, Dr. Stoffa conducted an upper gastrointestinal endoscopy of Plaintiff, revealing a normal esophagus except for a single small erosion; a normal gastroesophageal junction; a small hiatus hernia; a non-bleeding cratered gastric ulcer; and a few, small non-bleeding erosions in the gastric antrum. (<u>Id.</u> at 495-97.) Biopsies were taken, revealing mild reactive changes suggestive of reflux esophagitis and mild chronic gastritis. (<u>Id.</u> at 416-17, 493-94.) Dr. Stoffa recommended to Dr. Anderson that Plaintiff follow an antireflux regimen indefinitely, use a proton pump inhibitor twice a day, and avoid aspirin and non-steroidal anti-inflammatory drugs, e.g., ibuprofen. (<u>Id.</u> at 521-22.)

Plaintiff saw Dr. Prather ten days later for knee pain, greater on the right than on the left. (<u>Id.</u> at 471-72.) Her cervical spine range of motion was limited with rotation, extension, and side-bending to the left. (<u>Id.</u> at 471.) She had no effusion in her right knee, but did have pain on the lateral joint line and with forced knee flexion. (<u>Id.</u>) Dr. Prather's diagnosis was giveway in the knee with episodes of locking; axial neck pain; and lumbar radiculopathy in an L5 distribution. (<u>Id.</u>) To determine whether there was a meniscal injury, x-rays were to be taken. (<u>Id.</u>) Dr. Prather recommended an L5 injection. (<u>Id.</u>) The x-rays of her knees showed an "[u]nchanged mild left knee medial compartment osteoarthritis." (<u>Id.</u> at 474.) A subsequent magnetic resonance imaging (MRI) of her right knee showed "[m]oderate right patellofemoral chondrosis and mild right medical compartment chondrosis"; "[m]oderate

---

[6]There are no later records from Dr. Aubuchon.

sized right knee effusion with loose bodies in the posterior knee and synovitis in the popliteus hiatus"; and "[n]ormal right knee menisci and ligaments." (Id. at 476-77.)

On May 3, Dr. Prather administered a transforaminal epidural steroid injection to Plaintiff at left L5-S1. (Id. at 478.)

On May 7, Plaintiff consulted Rick Wright, M.D., an orthopedist with Washington University School of Medicine, for her complaints of right knee pain for the past three to five years. (Id. at 428-36.) The pain was an eight on a ten-point scale. (Id. at 432.) She had pain when bending the knee and when on steps and stairs. (Id.) On examination, she had minimal effusion in the right knee and none in the left. (Id. at 433.) Her range of motion was limited in the right knee. (Id.) She had joint line tenderness in the right knee, but not in the left. (Id.) X-rays of her knees showed "[m]oderate sized right knee effusion with a tiny loose body in the posterior knee" and "[m]ild medial compartment left knee osteoarthritis." (Id. at 430.) Dr. Wright's diagnosis was right knee patellofemoral chondrosis and right knee loose bodies. (Id. at 433.) Arthroscopic chondroplasty, loose body removal, and lateral release were discussed with Plaintiff. (Id.)

Four days later, Plaintiff telephoned Dr. Prather to request a letter stating that she could not do work hardening for weeks and could only stand or sit for fifteen minutes at a time. (Id. at 479.) There is no complying letter in the administrative record.

On May 17, Plaintiff consulted Katherine P. Buchowski, M.D., with Psych Care Consultants as a new patient. (Id. at 484-87, 771-74.) Plaintiff reported that she had been depressed her whole life, but it was becoming worse. (Id. at 484.) She was trying to get disability. (Id. at 486.) She was in chronic pain. (Id.) On examination, she had an alert and

cooperative appearance; normal rate, rhythm, tone, and volume of speech; linear and goal-directed thought process; normal concentration; good insight and judgment; and constricted affect. (Id.) She was oriented to self, date, and place. (Id.) She described her mood as "depressed." (Id.) Dr. Buchowski diagnosed Plaintiff with major depression disorder, rated her current Global Assessment of Functioning (GAF) as 55,[7] and rated the highest GAF she had had in the past year as 60. (Id. at 487.) Plaintiff was to be seen at the next available appointment and then monthly. (Id.)

Plaintiff reported to Dr. Prather on June 24 that she had had "good relief" with the transforaminal epidural steroid injection. (Id. at 536, 611-12.) She was recently having, however, increasing symptoms. (Id.) She thought her knee and ankle complaints were related to her back pain. (Id.) She was pleased with her progress. (Id.) On examination, Plaintiff had pain only with forward flexion of her lumbar spine; her strength testing, including with knee extension and ankle dorsiflexion, was normal. (Id.) Dr. Prather diagnosed knee pain and low back pain. (Id.) She discussed with Plaintiff the importance of aerobic and therapeutic exercises. (Id.) Plaintiff wanted to restart therapy; a new prescription was written. (Id. at 536, 632-33.) The tramadol prescription was rewritten. (Id. at 536.)

---

[7]"According to the *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th Ed. Text Revision 2000) [DSM-IV-TR], the [GAF] is used to report 'the clinician's judgment of the individual's overall level of functioning,'" **Hudson v. Barnhart**, 345 F.3d 661, 663 n.2 (8th Cir. 2003), and consists of a number between zero and 100 to reflect that judgment, **Hurd v. Astrue**, 621 F.3d 734, 737 (8th Cir. 2010). A GAF score between 51 and 60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." DSM-IV-TR at 34 (emphasis omitted).

The next day, an upper gastrointestinal endoscopy performed by Dr. Stoffa revealed that Plaintiff had a normal esophagus, a small hiatus hernia, and diffuse mildly erythematous mucosa (inflamed lining) in the gastric antrum. (Id. at 699-700).

On June 28, Plaintiff had an EMG and nerve conduction of her left upper extremity. (Id. at 613-14, 653-59.) They revealed a left compression of the median nerve at the wrist affecting motor and sensory fibers. (Id. at 614.)

Plaintiff was next seen by Dr. Buchowski on July 6. (Id. at 483, 770.) Plaintiff was focused on her medical problems and disability. (Id.) Her mood appeared good and was described by Plaintiff as "'not too bad.'" (Id.) Her insight and judgment were fair. (Id.) Her diagnosis had not changed. (Id.) Her prescription for Lexapro was renewed, and she was to return in one month. (Id.)

Three days later, an MRI of Plaintiff's cervical spine performed pursuant to Dr. Prather's request revealed mild to moderate degenerative changes of he cervical spine, with the most prominent finding being a moderate left foraminal stenosis at C5-C6. (Id. at 663-64.)

Plaintiff consulted Ryan Calfee, M.D., with Washington University Orthopedics, on July 15 for her complaints of left hand numbness and tingling. (Id. at 617-18, 651-52.) She reported that the tingling was constant and increased with activity. (Id. at 617.) On examination, there was no atrophy in the hand and full and symmetric grip strength. (Id.) He opined she might have carpal tunnel syndrome, administered a corticoid steroid injection, and recommended night splints for a month. (Id. at 618.) She was to return in one month. (Id.)

Plaintiff saw Dr. Buchowski on August 5. (Id. at 769.) On examination, she was as before. (Id.) She described her mood as "'not bad.'" (Id.) She did not want to continue taking Wellbutrin; Lexapro was prescribed instead. (Id.)

Plaintiff saw Dr. Calfee on August 25, reporting that she had had less night-time symptoms, numbness, and tingling, but did not have any greater strength with gripping or holding onto objects. (Id. at 620.) The possibility of carpal tunnel release and an ulnar nerve decompression was discussed. (Id.) Plaintiff understood there was no urgency and stated she would call if things got worse. (Id.)

Five days later, Plaintiff telephoned Dr. Prather to request that her dose of tramadol be doubled as the lower dose was not helping and she continued to have back pain. (Id. at 630.)

Dr. Prather saw Plaintiff again on September 23, noting that Plaintiff reported that physical therapy had "really helped" and she was "getting some improvement." (Id. at 621-22.) She was trying to increase her walking time and had done some gardening. (Id. at 621.) She still occasionally had neck pain and posterior pelvic pain, but was doing better overall. (Id.) On examination, she had no pain with a range of motion exercise. (Id.) She was diagnosed with neck pain and posterior pelvic pain, improved. (Id.) Her prescription for Ultram was increased to a longer-lasting dose and her prescription for physical therapy was renewed. (Id. at 623, 621, 634-35)

Plaintiff returned to Dr. Anderson on September 27, reporting that she felt a little better than she had at the last visit. (Id. at 520, 525-26.) She was still having significant headaches. (Id. at 520.) Tramadol helped her back pain, but not her headaches. (Id.) He

suspected they were tension headaches.  (Id.)  She had no edema in her extremities.  (Id.)

She generally took her medications regularly.  (Id.)  His impression was that her depression

was better on the Wellbutrin and Lexapro and that she should try Floricet for her headaches.

(Id.)  Her blood pressure was elevated that day, but was under "excellent control" on her

current medications.  (Id.)  She was to have a fasting lipid profile.  (Id.)  She was to return

in four months or sooner if needed.  (Id.)

When Plaintiff saw Dr. Buchowski on October 5, she was stable and was continued

on Lexapro.  (Id. at 768.)

The next day, Plaintiff went to the Washington University Eye Center (Eye Center)

and was diagnosed with cataracts.  (Id. at 540-42, 684-86.)  Surgery was not to be considered

yet.  (Id. at 541.)

At Plaintiff's November 22 visit, Dr. Prather noted that the physical therapist had

suggested that Plaintiff see a pelvic floor therapist because she was having some problems

with bladder incontinence.  (Id. at 537, 623-24.)  On examination, Plaintiff was "able to go

through lumbar flexion, extension, side bending and rotation . . . without pain."  (Id. at 537.)

She did not have an antalgic gait.  (Id.)  She was given a renewed prescription for tramadol,

a prescription for massage therapy, and an extension for physical therapy.  (Id. at 537, 641-

43.)

The next day, Dr. Buchowski prescribed buspirone and renewed Plaintiff's

prescription for Lexapro.  (Id. at 767.)  On examination, Plaintiff was as before.  (Id.)  She

described her mood as "'ok.'"  (Id.)

When seen by Dr. Buchowski in January, 2011, and again the next month, Plaintiff was stable.  (Id. at 765, 766.)  Her prescriptions were renewed.  (Id.)

On April 4, Plaintiff saw Dr. Prather to request a renewal of the prescription for massage therapy.  (Id. at 627-28.)  She had not been able to pursue it earlier due to lack of finances.  (Id. at 627.)  The prescription was renewed, as was one for physical therapy.  (Id. at 627, 645-47.)

Plaintiff was unchanged when seen by Dr. Buchowski on April 14.  (Id. at 764.)

Plaintiff returned to the Eye Center on April 29, reporting that she thought she could postpone cataract surgery.  (Id. at 538-39, 682-83.)  It was taking her longer in the mornings for her eyes to focus and she no longer drove at night because of the glare from headlights.  (Id. at 538.)

Plaintiff was unchanged when seen by Dr. Buchowski in May; her prescriptions were renewed.  (Id. at 763.)

Dr. Prather noted when seeing Plaintiff on June 13 that she had not been using tramadol, but had been taking Norco (a combination of hydrocodone – an opioid pain medication – and acetaminophen) three to four times a day when the pain was bad.  (Id. at 672-73.)  On examination, she walked with "a slightly forward flexed gait with slight Trendelenburg."[8]  (Id. at 672.)  Strength testing was normal.  (Id.)  Dr. Prather's impression was of low back and neck pain, carpal tunnel syndrome, knee osteoarthritis, and myofascial

---

[8]A person walks with a Trendelenburg gait when her hip abductor muscles are weak.  NCBI, Gait Analysis, http://www.ncbi.nlm.nih.gov/books/NBK27235/ (last visited Mar. 27, 2014).  If the left hip drops, then she swings her body to the right to compensate; the reverse is true if her right hip drops.  Id.

pain.  (Id.)  She opined that Plaintiff needed "comprehensive care" and recommended Plaintiff consider the St. Louis Behavioral Institute.  (Id.)  Plaintiff was to consider doing so. (Id.)

Plaintiff was described by Dr. Buchowski as stable when seen on June 27 and again on July 28; her prescriptions were renewed.  (Id. at 761-62.)

On July 29, Dr. Stoffa conducted another upper gastrointestinal endoscopy on Plaintiff.  (Id. at 689-91.)  This revealed Grade A ("[o]ne or more mucosal breaks confined to the mucosal folds, each not more than 5 mm in maximum length"[9]) esophagitis and an otherwise normal esophagus.  (Id. at 689.)  Also, there was inflamed slightly raised mucosa at the gastroesophageal junction; a small hiatus hernia; and diffuse, non-bleeding mildly erythematous mucosa in the gastric antrum.  (Id. at 689.)  Biopsies were taken, revealing squamous mucosa with features of reflux esophagitis and chronic inflammation. (Id. at 687.)

Plaintiff reported to Dr. Buchowski in August that she was not doing well.  (Id. at 760.)  The lack of a decision on her disability application and worker's compensation case had increased her depression.  (Id. at 760.)  She was to get a list of therapists.  (Id.)

In addition to the foregoing medical records, various assessments of Plaintiff's physical and mental functional capacities were before the ALJ.

In August 2010, a Physical Residual Functional Capacity Assessment (PRFCA) of Plaintiff was completed by Tracy Gamayo, a single decision maker.[10]  (Id. at 66-67.)

_____

[9] N C B I ,  C o m m o n   E s o p h a g i t i s   G r a d i n g   S c a l e s , http://www.ncbi.nlm.nih.gov/books/NBK42940/ (last visited Mar. 27, 2014).

[10] See 20 C.F.R. §§ 404.906, 416.1406 (defining role of single decision-maker under proposed modifications to disability determination procedures).  See also **Shackleford v. Astrue**, 2012 WL

Plaintiff's impairments resulted in exertional limitations of Plaintiff being able to occasionally lift or carry twenty pounds; frequently lift or carry less than ten pounds; stand or walk for approximately two hours in an eight-hour day; and sit for approximately six hours during that period. (Id. at 67.) Her abilities to push and pull were otherwise unlimited. (Id.) She had no postural, manipulative, visual, communicative, or environmental limitations. (Id. at 68-69.)

The same month, a Psychiatric Review Technique form was completed for Plaintiff by a non-examining consultant, Kyle DeVore, Ph.D. (Id. at 504-15.) Plaintiff was assessed as having an affective disorder, i.e., major depressive disorder. (Id. at 504, 507.) This disorder resulted in mild restrictions in her daily living activities, mild difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. (Id. at 512.) There were no repeated episodes of decompensation of extended duration. (Id.)

On a Mental Residual Functional Capacity Assessment form, Dr. DeVore assessed Plaintiff as being moderately limited in one of the three abilities in the area of understanding and memory, i.e., understanding and remembering detailed instructions, and not significantly limited in the other two. (Id. at 516.) In the area of sustained concentration and persistence, Plaintiff was moderately limited in one of the eight listed abilities, i.e., the ability to carry out detailed instructions, and was not significantly limited in the other seven. (Id. at 516-17.) In the area of social interaction, Plaintiff was moderately limited in two of the five listed

---

918864, *3 n.3 (E.D. Mo. Mar. 19, 2012) ("Single decision-makers are disability examiners authorized to adjudicate cases without mandatory concurrence by a physician.") (citation omitted).

abilities: the ability to interact appropriately with the general public and the ability to accept instructions and respond appropriately to criticism from supervisors. (Id. at 517.) She was not significantly limited in the other three abilities. (Id.) In the area of adaptation, she was not significantly limited in any of the four abilities. (Id.)

Pursuant to her worker's compensation claim, Plaintiff underwent an IME by David T. Volarich, D.O., in June 2010. (Id. at 739-58.) He noted that Plaintiff "required daily doses of medication for her [IBS]" to avoid getting diarrhea. (Id. at 745.) He concluded that, as a result of the August 2008 injury, she had a 45 percent permanent partial disability of the left lower extremity rated at the ankle; a 25 percent permanent partial disability of the right upper extremity rated at the elbow; a 7.5 percent permanent partial disability or the right hand; a 5 percent permanent partial disability of the body as a whole; and a 5 percent permanent partial disability or the right lower extremity rated at the knee. (Id. at 753.) Before her 2008 injury, she had a 25 percent permanent partial disability of the body as a whole rated at the lumbosacral spine; a 12.5 percent permanent partial disability of the body as a whole rated at the cervical spine; a 40 percent permanent partial disability of the left upper extremity rated at the shoulder; and a 15 percent permanent partial disability of the left upper extremity rated at the wrist. (Id. at 754.)

In March 2011, Plaintiff was evaluated by James M. England, Jr., a vocational rehabilitation counselor, pursuant to her worker's compensation claim. (Id. at 543-68.) He reviewed Plaintiff's medical records, beginning with those of an injury to her back in 1986 when lifting packages at a childcare center where she was employed, and Dr. Volarich's report of his IME. (Id. at 542-63.) He also interviewed Plaintiff about her current activities,

medications, symptoms, and limitations. (<u>Id.</u> at 564-67.) Mr. England then concluded that Plaintiff's back and extremity issues prevented her from lifting even the amount required for sedentary work. (<u>Id.</u> at 568.) He believed she was "totally disabled from a vocational standpoint." (<u>Id.</u>)

In August 2011, Dr. Stoffa completed an IBS Residual Functional Capacity Questionnaire on Plaintiff's behalf. (<u>Id.</u> at 704-07.) Her prognosis was "medically good," but she continued to have symptoms despite therapy. (<u>Id.</u> at 704.) The symptoms included chronic diarrhea, abdominal pain and cramping, abdominal distention, nausea, malaise, fatigue, and mucus in her stools. (<u>Id.</u>) There were no objective signs of her symptoms. (<u>Id.</u> at 705.) She was not a malingerer. (<u>Id.</u>) Emotional factors did contribute to the severity of her symptoms; however, he was not a psychiatrist and did not diagnose the psychological conditions affecting her physical condition. (<u>Id.</u>) During a typical workday, her symptoms and pain would frequently interfere with her ability to concentrate and pay attention. (<u>Id.</u>) He could not respond to the question asking how she would tolerate work stress as stress was subjective. (<u>Id.</u>) He could not estimate the exertional limitations placed on Plaintiff by her IBS. (<u>Id.</u> at 706.) She would need a job that provided ready access to a restroom and allow for unscheduled restroom breaks. (<u>Id.</u>) She would not have much advance notice of the need to use a restroom. (<u>Id.</u>) Because of her IBS, she would miss more than four days of work a month. (<u>Id.</u> at 707.)

The next month, Sandra L. Tate, M.D., with the St. Louis Orthopedic Institute, evaluated Plaintiff. (<u>Id.</u> at 709-11.) Plaintiff described her chief complaints as being neck and low back pain that was an eight on a ten-point scale and numbness in all her fingers. (<u>Id.</u>

at 710.)  The pain was aggravated by bending, coughing, sneezing, standing, kneeling, and walking.  (Id.)  On examination, her mood and affect were appropriate.  (Id.)  She had no paravertebral muscle spasms or tenderness in her cervical spine, no foraminal encroachment, and no identifiable trigger points.  (Id.)  Her range of motion in her cervical spine was 40 degrees on flexion, 50 on extension, 70 on rotation to the left and normal on rotation to the right, and 40 degrees on side bending to the left and normal to the right.  (Id.)  She had a normal range of motion in her elbows and no instability in her shoulders elbows, or wrists, although there was tenderness to palpation.  (Id.)  She had diffuse paravertebral tenderness without muscle spasm in her lumbosacral spine.  (Id.)  Her range of motion in that spine was 80 degrees on flexion.  (Id.)  Side bending was normal.  (Id.)  Straight leg raises were negative to 90 degrees.  (Id.)  Her right lower extremity had a decreased sensation to light touch and pinprick.  (Id.)  Muscle strength was normal in her lower extremities.  (Id.)  Her gait was within normal limits; she had no coordination deficits.  (Id. at 711.)  Dr. Tate's impression was of prior shoulder rotator cuff repair; chronic low back pain with degenerative changes; and left ankle pain.  (Id.)  Plaintiff should not lift anything heavier than twenty pounds, lift above shoulder level, or stand or walk for long.  (Id.)  She was not otherwise limited. (Id.)

The next day, Plaintiff was evaluated by Kimberly Buffkins, Psy.D., a clinical psychologist.  (Id. at 730-38.)  She was described both as living with her boyfriend's mother for the past four years and as being married to her second husband for twenty years, with whom she had a good relationship.  (Id. at 730, 731.)  On examination, Plaintiff was overweight, clean, casually dressed, and had normal grooming and hygiene.  (Id. at 732.)

She was cooperative, calm, and able to easily smile and appropriately laugh during the interview. (Id.) She was oriented to all spheres. (Id.) Her mood was euthymic (neither depressed nor highly elevated) with an appropriate affect; her speech was coherent and normal in rate and tone; her thought content lacked delusions or suicidal or homicidal ideations. (Id.) She reported she prepared simple meals, did light household chores, and went grocery shopping. (Id. at 733.) She got along with family members and "people in general." (Id.) Her concentration, persistence, and pace were adequate. (Id.) Her responses on the Minnesota Multiphasic Personality Inventory-2-RF "suggest[ed] an over-reporting of somatic complaints and possible over reporting of psychological dysfunction." (Id. at 733, 735.) She reported feeling depressed, but "[did] not appear particularly sad or unhappy." (Id. at 733.) On Traits A and B, she scored below average but not deficient. (Id.) Dr. Buffkins diagnosed Plaintiff with dysthymic disorder and rated her GAF as 70.[11] (Id.) Her prognosis was fair. (Id.)

Dr. Buffkins also completed a Medical Source Statement of Ability to Do Work-Related Activities (Mental) for Plaintiff. (Id. at 736-38.) She assessed Plaintiff as having mild limitations in her abilities to understand, remember, and carry out complex instructions and in her ability to make judgments on complex work-related decisions. (Id. at 736.) She had no limitations when those instructions and decisions were simple. (Id.) She had mild limitations in her ability to respond appropriately to usual work situations and to changes in

_____

[11]A GAF score between 61 and 70 indicates "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." DSM-IV-TR at 34 (emphasis omitted).

a routine work setting, but was not limited in her abilities to interact appropriately with the public, coworkers, and supervisors.  (Id. at 737.)

That same month, Plaintiff was evaluated by Saul Silvermintz, M.D., an internist.  (Id. at 714-27.)  Her chief complaints were of shoulder pain, low back pain, neck pain, a hernia, IBS, bronchial asthma, hypertension, bilateral carpal tunnel syndrome, interstitial cystitis, and ankle pain.  (Id. at 714.)  She had had two rotator cuff surgeries.  (Id.)  Her low back pain was severe and radiated down her left leg; her neck was also severe.  (Id.)  Because of her hernia, food came up when she bent over.  (Id. at 714-15.)  A gastric ulcer was almost healed.  (Id. at 715.)  She had diarrhea four to six times a day; it came without warning.  (Id.)  Her asthma was aggravated during certain seasons and was adversely affected by certain smells.  (Id.)  Her hypertension was fairly well-controlled.  (Id.)  Her bilateral carpal tunnel syndrome made it hard for her to hold or do things.  (Id.)  The range of motion in her shoulders, neck, and back was limited.  (Id. at 716, 726, 727.)  There were no swelling or malformations in her four extremities and no evidence of carpal tunnel syndrome.  (Id. at 716.)  Tinel's signs were absent.  (Id.)  Her gait was normal.  (Id.)  She walked on her heels and toes; got up on the table without difficulty, but had to turn herself to the side and brace herself when coming up from a supine position; moved around the room well; and had no trouble with fine finger movements.  (Id.)  She had a normal range of motion in her wrists, knees, hips, ankles, and elbows.  (Id. at 726, 727.)  She had bilateral full grip strength.  (Id. at 726.)  Straight leg raises produced pain at 90 degrees.  (Id. at 716.)  Muscle strength was normal.  (Id.)  Her corrected vision in each eye was 20/20.  (Id. at 725.)  Dr. Silvermintz diagnosed Plaintiff with obesity; controlled hypertension; probable disc disease of cervical

and lumbar spine; probable degenerative joint disease of the shoulders, knees, and ankles; IBS, "which incapacities her working"; GERD; migraine headaches; and history of gastric ulcer and bronchial asthma "with multiple other allergies." (Id. at 717.)

Dr. Silvermintz also completed a Medical Source Statement of Ability to Do Work-Related Activities (Physical) (MSS). On this form, Dr. Silvermintz assessed Plaintiff as having the ability to occasionally lift and carry up to twenty pounds, but as being unable to frequently lift and carry any weight. (Id. at 719.) She could sit without interruption for eight hours and stand for one. (Id. at 720.) She could stand for a total of three hours in an eight-hour work day.[12] (Id.) She did not need to use a cane. (Id.) She should never use either hand for pushing or pulling, but could continuously use either hand for handling, fingering, and feeling; frequently use her right hand for reaching overhead; occasionally use her left hand for reaching overhead; and occasionally use either hand for all other reaching. (Id. at 721.) She should only occasionally operate foot controls. (Id.) She should never climb, balance, stoop, kneel, crouch, or crawl. (Id. at 722.) She should never be exposed to such environmental conditions as unprotected heights; moving mechanical parts; operating a motor vehicle; humidity and wetness; dust, odors, fumes, and pulmonary irritants; vibrations; and extreme cold and heat. (Id. at 723.) She could be exposed to noise on a moderate basis. (Id.) She could engage in such activities as shopping, walking a block at a reasonable pace, preparing a simple meal, caring for her personal hygiene, traveling alone, and sorting and

---

[12]The length of time during which Plaintiff could walk, with or without interruption, is illegible.

handling papers and files.  (Id. at 724.)  Her limitations could be expected to last, or have

lasted, for twelve consecutive months.  (Id.)

Another report before the ALJ was that of a detective, Flint Dees, with the

Cooperative Disability Investigations Unit.  (Id. at 253-57.)  Mr. Dees noted Plaintiff's

description of her activities of daily living as being able to drive short distances; not

socializing with other people because she could not sit or stand for very long or walk very

far; having difficulties with memory, concentration, and following instructions; and having

problems with climbing stairs, using her hands, bending, squatting, kneeling, reaching,

lifting, and carrying objects.  (Id. at 255.)  Before her consultative examination with Dr. Tate,

Mr. Dees stationed himself outside her house and saw her walk to her Ford Explorer from

the house.  (Id. at 255-56.)  She carried a piece of paper and cane in her left hand and a cup

in her right hand.  (Id. at 256.)  "A large purse was draped over her left arm."  (Id.)  "She

walked with short even strides, never employing the cane for assistance."  (Id.)  She stepped

into the Explorer without any apparent difficulties and, at one point, raised both arms above

her head.  (Id.)  When arriving at Dr. Tate's building, Plaintiff walked "along a slight uphill

grade" to the building with the same stride as before and, without apparent hesitation,

stepped up on a large curb.  (Id.)  She did not have her cane with her.  (Id.)  She climbed,

slowly and steadily, up the stairs, although there was an elevator, and sat for approximately

twenty-five minutes completing paperwork before being seen.  (Id.)  On the day of her

appointment with Dr. Silvermintz, Plaintiff's vehicle was not at her house thirty minutes

before the appointment.  (Id.)  Mr. Dees went to Dr. Silvermintz' office and saw Plaintiff

there, seated and completing paperwork.  (Id.)  She did not have any apparent difficulty on

either occasion completing the paperwork or being seated in close proximity to others in the waiting rooms. (Id.) A video of the surveillance was submitted with the written report. (Id. at 257.)

## The ALJ's Decision

The ALJ first found that Plaintiff met the insured status requirements of the Act through December 31, 2014, and had not engaged in substantial gainful activity since her alleged disability onset date of January 28, 2010. (Id. at 13.) He next found that she had severe impairments of residuals from tarsal tunnel release, patellofemoral of the right knee, chondrosis, chondrosis medial compartment, degenerative disc disease, asthma, and dysthymic disorder. (Id.) She also had nonsevere impairments of hypertension, IBS, GERD, and migraine headaches. (Id.) She did not have, however, an impairment or impairments that met or medically equaled an impairment of listing-level severity. (Id. at 14.) Her mental impairments were not as severe as she described. (Id.) Specifically, they did not result in significant limitations in her activities of daily living or in severe limitations in her social functioning or in concentration, persistence, and pace. (Id.) Instead, she had mild restrictions in her activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, and pace. (Id. at 14-15.) She had not had any repeated episodes of decompensation. (Id. at 15.)

The ALJ next determined that Plaintiff had the residual functional capacity (RFC) to perform sedentary work with additional limitations of (a) only occasional stooping, kneeling, crouching, and climbing of stairs and ramps; (b) never crawling or climbing ropes, ladders, or scaffolds; (c) frequently reaching overhead; (d) frequently using her hands for

gross and fine manipulation; and (e) needing to avoid concentrated exposure to extreme cold or heat, wetness, humidity, fumes, odors, dust, gases, vibrations, and hazards of height. (Id.) Also, she could understand, remember, and carry out at least simple instructions and non-detailed tasks; demonstrate adequate judgment to make simple work changes; perform some complex tasks; and perform work at a normal pace without production quotas. (Id.)

When detailing the medical record, including treatment records and consultative examination reports, the ALJ noted that Plaintiff had not returned to Dr. Aubuchon for treatment of her ankle after he found she was ready to do work hardening and that she had a normal gait on the two subsequent examinations by Drs. Tate and Silvermintz. (Id. at 15-16.) Addressing Plaintiff's complaints of right knee problems, the ALJ noted that she had a full range of motion in her knee when examined by Drs. Tate and Silvermintz. (Id. at 16-17.) Addressing Plaintiff's complaints of back pain, the ALJ further noted that the record of such complaints followed a pattern of them not being supported by objective findings. (Id. at 17-18.) Her asthma was controlled. (Id. at 18.) There was no evidence that Plaintiff had ever missed work, or been incapacitated by migraines. (Id. at 19.) The limitations found by Drs. Tate and Silvermintz were "generally consistent with the records, supportive of the [RFC], and given some weight," as was the opinion of Dr. Buffkins. (Id. at 19, 20.)

The ALJ next outlined several inconsistencies between Plaintiff's descriptions of her symptoms and other evidence in the record, including Plaintiff's reports that she was the primary care-giver for her elderly father, her report to the physical therapist that she was

gardening,[13] and the investigative report. (Id. at 20-21.) There was also evidence that she had stopped working because the facility had closed, not because of her impairments. (Id. at 21.) Also in the reports were indications she was over-reporting her symptoms or describing subjective complaints more numerous than the supporting objective evidence. (Id.)

With her RFC, Plaintiff could perform her past relevant work as a mail clerk or a food and beverage order clerk. (Id. at 21.) She could also perform work as an appointment clerk or order clerk. (Id.) She was not, therefore, disabled within the meaning of the Act. (Id. at 23.)

## **Standards of Review**

Under the Act, the Commissioner shall find a person disabled if the claimant is "unable to engage in any substantial activity by reason of any medically determinable physical or mental impairment," which must last for a continuous period of at least twelve months or be expected to result in death. 42 U.S.C. § 423(d)(1)(A). Not only the impairment, but the inability to work caused by the impairment must last, or be expected to last, not less than twelve months. **Barnhart v. Walton**, 535 U.S. 212, 217-18 (2002). Additionally, the impairment suffered must be "of such severity that [the claimant] is not only unable to do [her] previous work, but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the

---

[13]The report referred to is one in September 2010. (Id. at 590.) The therapist reported that Plaintiff had been increasing her activity level by walking approximately for approximately fifteen minutes two or three times a week and had been "doing some gardening." (Id.)

national economy, regardless of whether . . . a specific job vacancy exists for [her], or whether [s]he would be hired if [s]he applied for work." 42 U.S.C. § 423(d)(2)(A).

The Commissioner has established a five-step process for determining whether a person is disabled. See 20 C.F.R. § 404.1520; **Hurd**, 621 F.3d at 738; **Gragg v. Astrue**, 615 F.3d 932, 937 (8th Cir. 2010); **Moore v. Astrue**, 572 F.3d 520, 523 (8th Cir. 2009). "Each step in the disability determination entails a separate analysis and legal standard." **Lacroix v. Barnhart**, 465 F.3d 881, 888 (8th Cir. 2006). First, the claimant cannot be presently engaged in "substantial gainful activity." See 20 C.F.R. § 404.1520(b); **Hurd**, 621 F.3d at 738. Second, the claimant must have a severe impairment. See 20 C.F.R. § 404.1520(c). The Act defines "severe impairment" as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities . . . ." Id.

At the third step in the sequential evaluation process, the ALJ must determine whether the claimant has a severe impairment which meets or equals one of the impairments listed in the regulations and whether such impairment meets the twelve-month durational requirement. See 20 C.F.R. § 404.1520(d) and Part 404, Subpart P, Appendix 1. If the claimant meets these requirements, she is presumed to be disabled and is entitled to benefits. **Warren v. Shalala**, 29 F.3d 1287, 1290 (8th Cir. 1994).

"Prior to step four, the ALJ must assess the claimant's [RFC], which is the most a claimant can do despite her limitations." **Moore**, 572 F.3d at 523 (citing 20 C.F.R. § 404.1545(a)(1)). "[RFC] is not the ability merely to lift weights occasionally in a doctor's office; it is the ability to perform the requisite physical acts day in and day out, in the

sometimes competitive and stressful conditions in which real people work in the real world."

**Ingram v. Chater**, 107 F.3d 598, 604 (8th Cir. 1997) (internal quotations omitted).

Moreover, "'a claimant's RFC [is] based on all relevant evidence, including the medical

records, observations by treating physicians and others, and an individual's own description

of his limitations.'" **Moore**, 572 F.3d at 523 (quoting Lacroix, 465 F.3d at 887); accord

**Partee v. Astrue**, 638 F.3d 860, 865 (8th Cir. 2011).

In determining a claimant's RFC, "'the ALJ first must evaluate the claimant's

credibility.'" **Wagner v. Astrue**, 499 F.3d 842, 851 (8th Cir. 2007) (quoting Pearsall v.

Massanari, 274 F.3d 1211, 1217 (8th Cir. 2002)). This evaluation requires that the ALJ

consider "'[1] the claimant's daily activities; [2] the duration, frequency and intensity of the

pain; [3] precipitating and aggravating factors; [4] dosage, effectiveness and side effects of

medication; [5] functional restrictions.'" **Id.** (quoting Polaski v. Heckler, 739 F.2d 1320,

1322 (8th Cir. 1984)). "'The credibility of a claimant's subjective testimony is primarily for

the ALJ to decide, not the courts.'" **Id.** (quoting Pearsall, 274 F.3d at 1218). After

considering the Polaski factors, the ALJ must make express credibility determinations and

set forth the inconsistencies in the record which caused the ALJ to reject the claimant's

complaints. **Singh v. Apfel**, 222 F.3d 448, 452 (8th Cir. 2000); **Beckley v. Apfel**, 152 F.3d

1056, 1059 (8th Cir. 1998).

At step four, the ALJ determines whether claimant can return to her past relevant

work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work

[claimant has] done in the past." 20 C.F.R. § 404.1520(e). The burden at step four remains

with the claimant to prove her RFC and establish that she cannot return to her past relevant

work.  **Moore**, 572 F.3d at 523; accord **Dukes v. Barnhart**, 436 F.3d 923, 928 (8th Cir. 2006); **Vandenboom v. Barnhart**, 421 F.3d 745, 750 (8th Cir. 2005).

If the ALJ holds at step four of the process that a claimant cannot return to past relevant work, the burden shifts at step five to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy.  **Pate-Fires v. Astrue**, 564 F.3d 935, 942 (8th Cir. 2009); **Banks v. Massanari**, 258 F.3d 820, 824 (8th Cir. 2001).  The Commissioner may meet her burden by eliciting testimony by a VE, **Pearsall**, 274 F.3d at 1219, based on hypothetical questions that "'set forth impairments supported by substantial evidence on the record and accepted as true and capture the concrete consequences of those impairments,'" **Jones v. Astrue**, 619 F.3d 963, 972 (8th Cir. 2010) (quoting Hiller v. S.S.A., 486 F.3d 359, 365 (8th Cir. 2007)).

If the claimant is prevented by her impairment from doing any other work, the ALJ will find the claimant to be disabled.

The ALJ's decision whether a person is disabled under the standards set forth above is conclusive upon this Court "'if it is supported by substantial evidence on the record as a whole.'" **Wiese v. Astrue**, 552 F.3d 728, 730 (8th Cir. 2009) (quoting Finch v. Astrue, 547 F.3d 933, 935 (8th Cir. 2008)); accord **Dunahoo v. Apfel**, 241 F.3d 1033, 1037 (8th Cir. 2001).  "'Substantial evidence is relevant evidence that a reasonable mind would accept as adequate to support the Commissioner's conclusion.'" **Partee**, 638 F.3d at 863 (quoting Goff v. Barnhart, 421 F.3d 785, 789 (8th Cir. 2005)).  When reviewing the record to determine whether the Commissioner's decision is supported by substantial evidence, however, the Court must consider evidence that supports the decision and evidence that fairly detracts from

that decision.  **Moore**, 623 F.3d at 602; **Jones**, 619 F.3d at 968; **Finch**, 547 F.3d at 935.  The Court may not reverse that decision merely because substantial evidence would also support an opposite conclusion, **Dunahoo**, 241 F.3d at 1037, or it might have "come to a different conclusion," **Wiese**, 552 F.3d at 730.

### Discussion

Plaintiff argues that the ALJ erred when ignoring certain limitations placed on her by Drs. Tate and Silvermintz; when finding her IBS is not a severe impairment; when citing Mr. Dees' report when assessing her credibility; when failing to bases his RFC on some medical evidence; and when failing to explain how Dr. Buffkins' report supported his finding that Plaintiff could "work at a normal pace without production quotas."  (R. at 15.)  Plaintiff further argues that these errors resulted in an improper hypothetical question to the VE.

The ALJ concluded that Plaintiff has the RFC to perform sedentary work with additional limitations of (a) only occasional stooping, kneeling, crouching, and climbing of stairs and ramps; (b) never crawling or climbing ropes, ladders, or scaffolds; (c) frequently reaching overhead; (d) frequently using her hands for gross and fine manipulation; and (e) needing to avoid concentrated exposure to extreme cold or heat, wetness, humidity, fumes, odors, dust, gases, vibrations, and hazards of height.  And, she can understand, remember, and carry out at least simple instructions and non-detailed tasks; demonstrate adequate judgment to make simple work changes; perform some complex tasks; and perform work at a normal pace without production quotas.  "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and

small tools. . . ." 20 C.F.R. § 404.1567(a). Such work requires only occasional walking and standing. Id.

"ALJs bear 'the primary responsibility for assessing a claimant's [RFC] based on all relevant evidence,'" **Wildman v. Astrue**, 596 F.3d 959, 969 (8th Cir. 2010) (quoting Roberts v. Apfel, 222 F.3d 466, 469 (8th Cir. 2010)); however, "a claimant's RFC is a medical question and 'at least some' medical evidence must support the ALJ's RFC determination," **id.** (quoting Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001)).  "Accordingly, 'the ALJ should obtain medical evidence that addresses the claimant's ability to function in the workplace.'" **Id.** (quoting Lauer, 245 F.3d at 704).

Dr. Tate assessed Plaintiff as being unable to engage in long standing and walking. The ALJ's limitation to sedentary work requires only occasional standing and walking. Moreover, Plaintiff reported to a physical therapy that she was walking two or three times a week for fifteen minutes and was observed by Mr. Dees to be seen walking without difficulty. Dr. Tate also found Plaintiff was not able to lift above shoulder height.  Her impression was of prior shoulder rotator cuff repair.  The ALJ was not required, however, to accept this opinion. See **Wagner v. Astrue**, 499 F.3d 842, 849 (8th Cir. 2007) (holding that the opinion of a consulting physician who exams claimant only once is generally not considered substantial evidence); **Charles v. Barnhart**, 375 F.3d 777, 783 (8th Cir. 2004) (same). See also **Martise v. Astrue**, 641 F.3d 909, 927 (8th Cir. 2011) (noting that ALJ is not required to rely entirely on a physician's opinion or have to choose between opinions).

Plaintiff argues the ALJ erred by not limiting her, as did Dr. Silvermintz, to no pushing or pulling, "a significant imitation [sic] in terms of work at the light level." (Pl.'s Br.

at 21.)  The ALJ, however, limited Plaintiff to sedentary work, which includes more restrictive exertional requirements than does light work.  See 20 C.F.R. § 404.1567(b) (noting that someone who can do light work can do sedentary work).  Unlike the definition of "light work," which specifically includes "some pushing and pulling of arm or leg controls," id., the definition of sedentary work does not, see 20 C.F.R. § 404.1567(a).  Moreover, Dr. Silvermintz' examination findings included normal muscle strength, a full grip strength, an ability to walk on her toes and heels, and a normal range of motion in Plaintiff's wrists, knees, hips, ankles, and elbows, and a full grip strength.  Nor did he find any evidence of carpal tunnel syndrome.  The lack of any objective findings to support the restriction of no pushing and pulling suggests that it is based on Plaintiff's description of her limitations.  There is no error in the ALJ disregarding the portions of Dr. Silvermintz' report that are based on Plaintiff's subjective descriptions.  See **Craig v. Apfel**, 212 F.3d 433, 437 (8th Cir. 2000).

Plaintiff further argues the ALJ erred when he disregarded Dr. Stoffa's responses on the IBS Residual Functional Capacity Questionnaire and instead found her IBS is not a severe impairment.  "An impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to work," i.e., "[it] would have no more than a minimal effect on the claimant's ability to work . . . ."  **Kirby v. Astrue**, 500 F.3d 705, 707 (8th Cir. 2007).  "Severity is not an onerous requirement for the claimant to meet, but it is also not a toothless standard . . . ."  **Id.** at 708 (internal citations omitted).

Dr. Stoffa opined that, because of her IBS, Plaintiff would need a job providing ready access to a restroom and unscheduled restroom breaks.  She would also miss more than four

days of work a month.  It is undisputed, however, that he never diagnosed her with IBS. Moreover, although Dr. Volarich noted that Plaintiff needed medication to control her IBS and, therefore, avoid having diarrhea, the record consistently reflects that she declined to take medication for her IBS.  It is well-established that an impairment that can be controlled by treatment or medication is not considered disabling.  See **Perkins v. Astrue**, 648 F.3d 892, 901 (8th Cir. 2011); **Brown v. Astrue**, 611 F.3d 941, 955 (8th Cir. 2010); **Wildman**, 596 F.3d at 965.  Plaintiff's complete absence of medication for a condition that can be controlled by medication is indicative of a minimal impact of that condition on her functioning.

Plaintiff next argues that the ALJ erred by finding Dr. Buffkins' report supported his RFC findings because that report does not address the ability of Plaintiff "'to work at a normal pace without production quotas.'"  (Pl.'s Br. at 22, quoting R. at 15.)  "'Even though the RFC assessment draws from medical sources for support, it is ultimately an administrative determination reserved for the [ALJ].'"  **Perks v. Astrue**, 687 F.3d 1086, 1092 (8th Cir. 2012) (quoting Cox v. Astrue, 495 F.3d 614, 619 (8th Cir. 2007)).  In addition to Dr. Buffkins' report, which included a GAF rating indicative of mild symptoms, the ALJ had before him the records of the only treatment sought by Plaintiff from a mental health professional for her allegedly disabling depression.  These records of Dr. Buchowski begin the month after Plaintiff applied for DIB and consistently indicate that Plaintiff was stable when taking her antidepressant medication.  Any lack in Dr. Buffkins' report to specifically address Plaintiff's ability to work at a normal pace does not undermine the other support in the record for the ALJ's conclusion she could do so.

"'Because a claimant's RFC is a medical question, an ALJ's assessment of it must be supported by some medical evidence of the claimant's ability to function in the workplace.'" **Moore**, 572 F.3d at 523 (quoting Steed v. Astrue, 524 F.3d 872, 875 (8th Cir. 2008)). Plaintiff argues that because the ALJ improperly weighed the opinions of Drs. Tate and Silvermintz and ignored the restrictions of Dr. Stoffa, his RFC findings lack the requisite "some medical evidence."  As discussed above, however, there is no error in the ALJ's weighing of those three physicians' assessments.[14]

Plaintiff also takes issue with the ALJ's consideration of Mr. Dees'  report when discrediting her subjective complaints.  As noted by the Commissioner, the report was but one factor the ALJ found considered when evaluating her credibility.  The other factors, e.g., the lack of supporting objective medical evidence, see **Renstrom v. Astrue**, 680 F.3d 1057, 1066 (8th Cir. 2012), the evidence she stopped work because the factory closed and not because of her impairments, see **Medhaug v. Astrue**, 578 F.3d 805, 816-17 (8th Cir. 2009) (finding it relevant to disability determination that claimant left work for reasons unrelated to alleged impairment); accord **Goff**, 421 F.3d at 792-93, the evidence that she "over-reported" her symptoms, see **Jones**, 619 F.3d at 973, and the evidence that she failed to comply with her treating physician's recommendations, e.g., to participate in a work hardening program, see **Kelley v. Barnhart**, 372 F.3d 958, 961 (8th Cir. 2004) (claimant's failure to follow

---

[14]Plaintiff also argues the ALJ's failure to properly consider her daily activities and third-party observations means that there is no medical evidence for his RFC findings.  His consideration of her daily activities is addressed below.  Plaintiff does not cite any third-party observations.

prescribed treatments was inconsistent with alleged severity of complaints), were properly considered by the ALJ when assessing Plaintiff's credibility.

Plaintiff correctly argues that an ability to do light housework and visit with friends does not mean a claimant can engage in competitive employment. (Pl.'s Br. at 23.) This argument, however, misapprehends the ALJ's findings. The ALJ found that Plaintiff's testimony that she *cannot* do yard work and describing limited activities was inconsistent with evidence she did gardening and engaged in such strenuous activities as caring for an ailing, disabled father. This finding, and other inconsistencies, are supported by the record. For instance, she stated she cannot farther than 100 feet without having to stop and rest; however, she was observed walking without difficulty and reported walking for fifteen minutes two to three times a week. She testified she cannot sit for longer than fifteen minutes, but was observed doing so. She stated she cannot hold onto anything, but was seen carrying a cup to her car. "An ALJ may discount a claimant's subjective complaints if there are inconsistencies in the record as a whole." **Van Vickle v. Astrue**, 539 F.3d 825, 828 (8th Cir. 2008). Moreover, even if the ALJ overstated Plaintiff's activities, he was not obligated to accept her testimony given the other support in the record for his adverse credibility determination. See **Mouser v. Astrue**, 545 F.3d 634, 638 (8th Cir. 2008) (finding that any overstatement by the ALJ of the claimant's daily activities did not require reversal given the other, substantial support in the record for his credibility findings).

In her final argument, Plaintiff contends that the ALJ's errors in his RFC findings led to a fatal failure to include the concrete consequences of her impairments in his hypothetical question to the VE. She correctly notes that hypothetical questions should do so. See

**Renstrom**, 680 F.3d at 1067; **Jones**, 619 F.3d at 972. "'The ALJ's hypothetical question to the [VE] needs to include only those impairments that the ALJ finds are substantially supported by the record as a whole.'" **Renstrom**, 680 F.3d at 1067 (quoting Martise, 641 F.3d at 927). The question need not incorporate additional limitations properly disregarded by the ALJ. **Id.** Such limitations may include those based on a discounted claimant's subjective complaints and those based on medical opinions that the ALJ has given less weight to than to others. **Id.** Accord **Perkins**, 648 F.3d at 902; **Heino v. Astrue**, 578 F.3d 873, 882 (8th Cir. 2009).

In the instant case, the ALJ included only those limitations he found to be supported by substantial evidence on the record as a whole. The Court's review of the record concludes that there is such evidence.

### Conclusion

An ALJ's decision is not to be disturbed "'so long as the . . . decision falls within the available zone of choice. An ALJ's decision is not outside the zone of choice simply because [the Court] might have reached a different conclusions had [the Court] been the initial finder of fact.'" **Buckner v, Astrue**, 646 F.3d 549, 556 (8th Cir. 2011) (quoting Bradley v. Astrue, 528 F.3d 1113, 1115 (8th Cir. 2008)). Although Plaintiff articulates why a different conclusion might have been reached, the ALJ's decision, and, therefore, the Commissioner's, was within the zone of choice and should not be reversed for the reasons set forth above.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is AFFIRMED and this case is DISMISSED.

An appropriate Order of Dismissal shall accompany this Memorandum and Order.


/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE


Dated this 31st day of March, 2014.